### JAMES HARTSHORN & another *vs.* SHOE AND LEATHER DEALERS' INSURANCE COMPANY.

An open policy of insurance on "property, lost or not lost, on board vessel or vessels, steamboat or steamboats, or land carriage, at and from ports or places to ports or places; all sums at risk under this policy to be indorsed hereupon and valued at the sum indorsed;" and the rate of premium "such per cent. as shall be written against each indorsement;" is an inchoate contract of insurance as to the shipments of property ordered after the date of the policy, and a new and separate insurance on each successive parcel of goods when indorsed on the policy; and no risk can be legally indorsed on such policy without the assent of both parties. And the contract cannot be affected by evidence of a usage that the rate of premium is to be the market rate.

ACTION OF CONTRACT to recover $4000 on a policy of insurance, dated February 11th 1858, by which the defendants caused the plaintiffs "to be insured, lost or not lost, fifteen thousand dollars, on property on board vessel or vessels, steamboat or steamboats, or land carriage, at and from ports or places to ports or places; all sums at risk under this policy to be indorsed hereupon and valued at the sum indorsed;" and the defendants "confessing themselves paid the consideration due unto them

Hartshorn & another *v.* Shoe and Leather Dealers' Insurance Company.

for this insurance by the insured, at and after the rate of such per cent. as shall be written against each indorsement." The indorsements on the policy are copied in the margin.*

At the trial before *Shaw*, C. J., the plaintiff became nonsuit, subject to the opinion of the full court upon the following case:

Edward Williams, accountant and bookkeeper of the plaintiffs, testified: " On Monday, March 22d, in the afternoon, Mr. Hartshorn told me there were goods coming, and it would be necessary to get an indorsement on the policy. I took it for granted they were coming from Philadelphia, as they generally were. I asked him how much. He said there should be $4000 or $5000. Through neglect, it slipped my mind, till about five o'clock. It was too late to go that night. The next morning, as soon as I came to the store, I took the policy and went to the office, and requested the clerk to make indorsement of $4000 on our policy on goods from Philadelphia in steamer coming from Philadelphia. I do not think I named the steamer, or knew the name. He told me the steamer from Philadelphia was lost, and all sunk. He did not make the indorsement then, or at any time. I do not think he gave any other reason for not making the indorsement. I immediately went back to the store, and met Mr. Hunt just going to the store, and had some conversation with him about the loss and the insurance. I arrived at the store between eight and nine o'clock. Neither of the partners was there at that time, nor had been there to my knowledge. I had not seen or heard from either of them that morning before going to the store. I had no other instruction than that I had received the day before, and had received no intelligence of the loss of the steamer."

Charles H. Hunt, one of the plaintiffs, testified: " I first received intelligence of goods on board steamer Palmetto on Tuesday, March 23d 1858, about ten o'clock in the forenoon.

| * Date. 1858. | Amount. | Rate. | Premium. | Vessel. | From | To |
|---|---|---|---|---|---|---|
| Feb. 11 | $1,500 | ¼ | 11.25 | Steamer City of New York | Phila. | Boston |
| April 3 | 1,300 | 1 | 13.00 | Barque Amy | Boston | Phila. |
| 6 | 1,000 | ½ | 5.00 | Steamer City of New York | Phila. | Boston |
| Mar. 23 | 4,000 | ¾ | 30.00 | Steamer Palmetto | Phila. | Boston |

Going to our store, I met Mr. Williams. He stated the loss of the Palmetto, and that the office refused to insure the shipments by the Palmetto. That was the first intelligence I had of the loss. Up to that time I had no reason to believe that the Palmetto was lost, or in immediate peril. On arriving at the counting-room, I received invoices and bills of lading of the shipment by the Palmetto, received them by that morning's mail, either on my arrival or soon after. After getting these, I went to the defendants' office, and asked their secretary why they would not indorse. He said the vessel was lost; said he was very sorry we had not got it in yesterday. I insisted on having it indorsed. He said of course he could not do that, for the vessel and cargo were both lost; said they were not bound, unless the indorsement was on. I insisted. He gave no other reason for not indorsing, than that the vessel and cargo were both lost. I told him we had got our invoices only that morning, and we could not indorse till we knew by what steamer the goods were to come. No indorsement was made at that time. I was in the insurance office again in two or three days, and saw the secretary. He said the policy did not cover anything till it was indorsed. I answered, we thought the policy covered everything we had afloat. At the last interview, I said I should look to them for the loss, and if they did not settle, I should be obliged to take measures to obtain our rights; that I should abandon, and look to them. Before the 10th of April I had an interview with the defendants' president at the office. He said we had no claim till indorsement was made. I told him distinctly we should abandon all to them, and look to the office for the loss. Previously to this, I had another interview with the president, when we had some talk about adjusting the loss. He made no objection to the form of abandonment, but said we might go ahead. We bought and paid for the goods at the prices charged."

Hunt was then asked whether he made an indorsement; the plaintiffs offering to show that he notified the defendant's secretary and president, that if they would not make the indorsement, the plaintiffs would. But it was ruled that an indorsement made by one party, without the consent of the company, could

not be given in evidence, as an indorsement contemplated by the policy.

The plaintiff Hartshorn testified : " The first notice we had of any goods coming was Monday afternoon, by invoice or .etter.  I said to the bookkeeper : ' We have a large quantity of goods coming by this steamer.  I do not not know when she sails, but you must take care to have it indorsed on the policy.' He asked me what steamer.  I said I did not know : here is an invoice, and it says nothing about what steamer.  He asked me how much, and I said, ' As much as $ 4000.'  Nothing more took place that day.  I took no steps to get insurance myself.  I did not get to counting-room till late next morning.  My partner then told me the Palmetto was lost.  Till that time I had no information of the loss.  I went to Philadelphia about the 6th or 7th March, and purchased the goods.  The reason why I did not go to the office and have what I had purchased indorsed on the policy was because I was not in the habit of indorsing till we received bills of lading."

Hunt, being recalled, further testified : " Always, when I have applied at the defendants' office, they have turned to a book to ascertain the established rate of premium.  When these other indorsements were made, both parties turned to a tariff rate.  I found different rates for winter and other seasons.  In regard to this particular risk, when I applied for an indorsement, I asked what the rate was ? and the secretary looked at his book and replied that he did not recollect the rate ; he referred to his book, and I considered that as settling the rate.  They did not object on the ground that the rate could not be ascertained.  Nothing further was said about the rate of premium.  In the indorsement made by me, I asked the secretary at the time what the premium was, and he told me.  It was done at the office.  The president was there.  I requested them to make the indorsement ; they declined.  I then notified them I should make it.  I asked the secretary the rate of premium by steamer from Philadelphia to Boston.  He answered three fourths per cent. ; and I inserted it."

Hunt, having testified that he was acquainted with the usage

as to rates of premium being written in, in open or running policies, was asked, " Is there any usage in regard to running policies when the risk is to be indorsed and the premium written in in each case, that it shall be at the market rate ? " The defendants objected ; and it was ruled that usage was not competent to fix the rate of premium, when the evidence showed an express dissent of the company to take the risk, without some evidence of their assent to a premium and valuation

*B. F. Thomas & E. Avery,* for the plaintiffs.

*B. R. Curtis & H. P. Curtis,* for the defendants.

DEWEY, J. The contract of insurance, like other contracts, requires a legal consideration to render it valid. The insurer, for a premium to be paid by the assured, undertakes to indemnify against loss on property exposed to peril. That the insurer is not allowed to receive or retain a premium for insurance where no risk has attached, is abundantly shown by the numerous cases where such prepaid premium has been recovered back by the assured. It must, from the nature of the case, be equally true that the payment of a premium, or a liability to pay the same, must always exist on the part of the assured, where the insurers are responsible for a risk. In those cases where the amount and value of goods are known, and also the mode of conveyance is arranged, the matter of premium is very easily adjusted between the parties, the same being paid either in cash, or by a note payable at a future day for the precise amount to be paid for the risk. The money or note thus taken is the absolute property of the insurer, and furnishes the consideration for the risk assumed. When the quantity of merchandise to be forwarded is not precisely known, the rate of premium is definitely fixed, and the gross sum to be paid made to depend upon the value subsequently ascertained from the invoice.

The difficulty in the present case arises from the peculiar terms of this policy. It is an open or running policy, the precise property to be covered by it to be ascertained and declared after the date of the policy, and open to the objections hereinafter stated. No doubt, in reference to an open policy, drawn in the form in which many policies are, it would be competent for

the assured to declare the subject to which the policy is to be applied after he had received knowledge of the loss. The validity of a general insurance, describing the articles of merchandise to be hereafter shipped on account of the assured, was sanctioned by the king's bench in *Kewley* v. *Ryan*, 2 H. Bl. 343. In that case the policy was at and from Grenada to Liverpool, in ship or ships warranted to sail before the 1st of August 1793. It was said by the court that the legality of a general insurance on goods to come in ship or ships was too well established both by usage and authority to be disputed. An insurance of this character had been sustained without any apparent objection in the earlier case of *Henchman* v. *Offley*, reported in a note to the last cited case, in which the policy was on goods to come in ship or ships from Bengal to London which should sail between the 1st of July and the 31st of December 1780. But in neither of those cases were the terms of the policy such as are found in the case before us.

That policies on goods by a ship or ships to be thereafter declared are valid, and that the party may declare after a loss, seems to be assumed in 1 Phillips on Insurance, § 438. This would be a perfectly reasonable construction of such a contract as applied to goods which were directly the subjects of the policy, and for which a premium had been stipulated to be paid. Take the case of a shipment of certain goods ordered by a resident of New York to be shipped from New Orleans — the character of the goods, the mode of conveyance, and the rate of premium all declared in the policy, but the precise amount or value, or the particular ship or ships by which they were to be sent, unknown to the assured — in such case the parties understand the insurance to cover all the goods ordered, and the premium agreed to be paid attaches to all the goods to be forwarded under such order. Here is a reciprocity in the obligations assumed by the parties. The premium for the risk is pai ', or agreed to be paid, and the policy attaches to the goods when the transportation commences. In such case it may properly be held that the indorsement on the policy may be made of the goods forwarded after the knowledge of the loss has come to the assured

But the plaintiffs particularly rely upon the case of *E. Carver Manuf. Co.* v. *Manufacturers' Ins. Co.* 6 Gray, 214, as decisive in their favor. It certainly has an important bearing upon the present case. It sanctions contracts between assured and insurers, by which the former may in certain cases declare the application of the policy to goods lost, after the knowledge of such loss has been received by him.

As already remarked, there are contracts of insurance where the parties obviously intend this, and both parties are bound whenever the goods are shipped to treat them as insured goods, for which on one hand the premium is to be paid, and on the other the policy is to attach. When the policy is upon a specified kind of goods, to be brought in a certain class of ships, within a stated time, from a certain port named, and with a rate of premium fixed, leaving nothing but the quantity and value of the goods to be declared and indorsed on the policy as invoices may be received, we see no objection to giving legal effect to it as embracing any such goods that may be lost, and known to be lost, before they are indorsed on the policy. Such a policy would imply that all the goods of the kind named, shipped within the time and manner stated, were to be covered by the insurance; and that as to all such goods, a premium would be earned, and good faith would require both parties to give full effect to such a policy.

The case of *E. Carver Manuf. Co.* v. *Manufacturers' Ins. Co.* had much of this character of certainty and definite understanding of the parties on all the points material to the risk and to the rate of premium, leaving nothing to be done but to enter the amount of the shipments upon the policy from time to time as they should come to the knowledge of the assured. It was definite in the following particulars: 1st. The character of the property to be insured was stated in the policy, " Cotton gins and banding." 2d. The ports from and to which they were to be shipped were stated, namely, " at and from New York to New Orleans." 3d. They were to be shipped by steamers. 4th. The time and duration of the policy was fixed, " to be closed in twelve months, if not sooner filled." 5th The rate of premium was

fixed in the policy, namely, " one per cent." Under such a policy it might well be held that the parties contemplated an insurance of all the " cotton gins and banding" of the plaintiffs that might be shipped in steamers from or to the ports named, to an amount not exceeding $25,000 (the sum named in the policy) during the period of twelve months from the date of the policy.

But the policy in the present case has not one of these five elements. 1st. It is an insurance " on property," and is wholly wanting in any description of the kind of property which is to be the subject of the risk. 2d. No ports are named from or to which it is to be transported. 3d. There is no limitation to a particular kind of vessels, but the policy extends to goods-transported by steamboats, sailing vessels, and land carriage. 4th. No time is named within which the policy is to be limited. 5th. No rate of premium is fixed by the policy, the insurers only " confessing themselves paid the consideration due unto them for this insurance by the assured at and after the rate of such per cent. as shall be written against each indorsement."

The policy itself demonstrates that the indorsement required was to be an act having the concurrence and sanction of both parties, as the rate of premium in every case of a new indorsement was to be "such per cent. as shall be written against each indorsement." The assured surely had not the right to fix the rate, nor was he obliged to make an indorsement with such a rate of premium, however high, as the insurers might demand. No rate of premium being fixed, no kind of vessels to be employed stated, no ports to or from which the goods were to be transported, the species of merchandise to be shipped entirely uncertain, all show that this was an inchoate contract of insurance as to shipments of property ordered after the date of the policy, and was to be practically a new and separate insurance on each successive parcel of goods as they were indorsed on the policy, and a rate of premium as agreed upon written against each indorsement.

That the plaintiffs so understood it, and acted upon the hypothesis that an indorsement was necessary to give effect to the policy as to new shipments, is strongly indicated by the course

of the evidence introduced at the trial. One of the witnesses says that one of the plaintiffs told him on the 22d of March that there were goods coming, "and it would be necessary to get an indorsement on the policy." One of the plaintiffs testifies that on that day he said to the bookkeeper, "We have a large quantity of goods coming by this steamer. I do not know when she sails, but you must take care to have it indorsed on the policy." Suppose the goods lost by the plaintiffs, and the subject of the present action, had arrived in safety in Boston, and no indorsement of the same had ever been made on the policy, or any proposition to do so, would the plaintiffs have been legally bound to pay a premium for the insurance thereof, the same as if an indorsement had been made? This would seem to be a test question as to the liability of the insurers to make good the loss of the same, as in the one case there would be a consideration for the promise to do so, and in the other there would not.

To make such an agreement binding, the stipulations and risks proposed must be mutually understood by the parties. 1 Phil. Ins. § 18. *Ocean Ins. Co.* v. *Carrington,* 3 Conn. 357. Here they were not; but matters necessary to the consummation of the contract were to be adjusted and agreed upon by the parties before an indorsement of new shipments of goods could properly be made.

Without therefore at all questioning the validity of a class of cases of open and running policies of a more restricted character, to which reference has been made, and where the indorsement was entered upon the policy after the knowledge of the loss, we are of opinion that the present case does not fall within that class.

As to the question of the competency of the proposed evidence of usage in respect to open and running policies, that the premium is to be at the market rate, this evidence was properly rejected, first, because such usage might well exist as to the class of open policies which have been referred to as valid, being definite in their description of the goods, the mode of conveyance, the ports from and to which they were to be carried, and the time of transportation, and not affect this case. But if the

inquiry was as to a usage more comprehensive, it would not avail the plaintiffs, as it would be inconsistent with the terms of this policy to give effect to any such usage. The provisions of this policy forbid this species of evidence. There are so many circumstances that might exist here, affecting the rate of premium, that it could not well be adjusted by adopting any principle of market rate of premium. But, further, the parties here, by the terms of the policy, provide that the premium shall be " such per cent. as shall be written against each indorsement," excluding the idea of a previously agreed mode of fixing the rate, but leaving that, as we have already construed the contract to imply, to be mutually agreed by the parties before indorsing the risk.

The decision of the supreme court of Louisiana in *Douville* v. *Sun Mut. Ins. Co.* 12 Louisiana Annual, 259, upon an open and running policy subject to some of the objections now urged, will be found to be in accordance with the views we have taken.

*Judgment for the defendants*